IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| YELITZA GRULLON, SRNA, BSN, RN, CCRN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 3:25cv279 |
| | ) |
| VIRGINIA COMMONWEALTH UNIVERSITY, | ) |
| | ) |
| MANU GUPTA, Ph.D., in his individual and | ) |
| official capacities, | ) |
| | ) |
| PAULA SONG, Ph.D., in her individual and | ) |
| official capacities, | ) |
| | ) |
| NICOLE DAMICO, Ph.D., CRNA, CHSE, FAANA, | ) |
| in her individual and official capacities, | ) |
| | ) |
| and | ) |
| | ) |
| BRENDA WANDS, Ph.D., MBA, CRNA, FAANA, | ) |
| CHSE, in her individual and official capacities, | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

Yelitza Grullon, SRNA, BSN, RN, CCRN ("Grullon"), by counsel, hereby states as follows as her Complaint against the following defendants: Virginia Commonwealth University ("VCU" or the "University"), Manu Gupta, Ph.D. ("Dr. Gupta") in his official and individual capacities, Paula Song, Ph.D. ("Dr. Song"), in her individual and official capacities, Nicole Damico, Ph.D. CRNA, CHSE, FAANA ("Dr. Damico"), in her individual and official capacities, and Brenda Wands, Ph.D., MBC., CRNA, FAANA, CHSE ("Dr. Wands"), in her official and individual capacities (collectively "Defendants").

## NATURE OF ACTION

1.      This is an action arising from Defendants' numerous unlawful acts against Grullon while she was enrolled as an SRNA[1] in VCU's highly-ranked Doctor of Nurse Anesthesia Practice ("DNAP") Program. These unlawful acts ultimately culminated in Grullon's unlawful dismissal from the Program.

2.      As explained below, Defendants unlawfully targeted Grullon, an outspoken student leader at VCU, based on her race, ethnicity, and her outspokenness. Dr. Wands, one of Grullon's supervisors, even called her a "gang leader" while she was serving as President of her VCU Class. She was later dismissed from the Program for bogus reasons. And while *Grullon* was *dismissed*, other similarly-situated white students – who were *not* outspoken -- were allowed to *stay enrolled* in the Program even though they committed conduct that was far worse than that allegedly committed by Grullon.

3.      Grullon's dismissal also was unlawful because it was carried out without proper due process and was based, in part, on grades that were the direct result of a complete failure by VCU to provide Grullon with a reasonable accommodation when she was getting over COVID-19 and otherwise dealing with anxiety and ADHD. VCU not only refused to acknowledge these key issues when it was reviewing Grullon's various requests to remain in the Program, but it dismissed her without even allowing her to present witnesses to support her position or have a representative speak on her behalf during the dismissal process.

4.      As a result of this conduct, Grullon now brings this action (i) for violation of her due process rights under the United States Constitution, (ii) for First Amendment retaliation, (iii) for violation of her rights under Title VI of the Civil Rights Act of 1964, (iv) for violation of her

---

[1] "SRNA" refers to Student Registered Nurse Anesthetist.

rights under Title II of the Americans with Disabilities Act ("ADA"), and for breach of contract, to hold Defendants liable for the harm they have caused Grullon and to return her to the DNAP Program from which she was unlawfully removed.

### JURISDICTION AND VENUE

5.     This Court has federal subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331. It has pendent and supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events giving rise to the claims occurred.

### PARTIES

7.     Grullon, a resident of Chesterfield, Virginia, has been a registered nurse since 2018. She is licensed to practice nursing in New York, California, and North Carolina, and also permitted be a nurse in Virginia through a compact between North Carolina and Virginia.  She is a black female with a Dominiican Republican ethnicity.  As well, at all times relevant, Grullon has suffered from anxiety and ADHD, both of which substantially limit one or more of her major life activities, such as her ability concentrate.

8.     VCU is a public university located in Richmond, Virginia.  Since 2007, VCU, through its Department of Nurse Anesthesia (the "Department"), has offered a Doctor of Nurse Anesthesia Practice degree through its DNAP Program.

9.     Dr. Gupta is, was, and at all relevant times has been, the interim Dean or Dean of the Graduate School at VCU.  He is sued in both his official and individual capacities.

10.     Dr. Song was, and at all relevant times has been, the interim Dean of the College of Health Professions at VCU.  She is sued in both her official and individual capacities.

11.     Dr. Damico is, was, and at all relevant times has been, an Assistant Professor in the Department and the Chairperson of the Department.  She is sued in both her official and individual capacities.  She is white.

12.     Dr. Wands is, was, and at all relevant times has been, the Director of VCU's DNAP Program.  She is sued in both her official and individual capacities.  She is white.

**FACTS**

A.     **VCU CREATES A PROTECTED PROPERTY INTEREST IN CONTINUED ENROLLMENT IN ITS DNAP PROGRAM.**

13.     In 2020, Grullon applied to VCU's DNAP program in Richmond, Virginia.  At the time, VCU's CRNA program – under which the DNAP Program falls – was ranked "as the nation's No. 1 program for the nurse anesthesia specialty by U.S. News & World Report,"[2] a ranking it apparently still holds.

14.     Although VCU initially waitlisted Grullon in 2020, she was ultimately able to enroll in the program in December 2021 and began her studies in January 2022.

15.     Students enrolled at VCU are accorded certain rights.  Under the "Rights and Responsibilities" section of the VCU Student of Conduct, for example, VCU provides as follows for *all* of its students:

> All student and RSO respondents are provided the following ***rights*** and responsibilities throughout the university student conduct process:
>
> •     To receive ***written notification of any alleged violation*** against them via official forms of university communication (i.e., VCU email) including a general summary of the complaint, contact information for the university

---

[2] https://nrsa.chp.vcu.edu/#:~:text=Learn%20why%20the%20VCU%20Department%20of%20Nurse%20Anesthesia,anesthesia%20specialty%20by%20U.S.%20News%20%26%20World%20Report (visited on September 19, 2023).

employee to receive additional information, and the date by which such contact must occur.

- To know the ***source*** of any allegation.

- To know the ***specific alleged violation(s)*** of this policy.

- To ***present their version of events*** giving rise to the allegations.

- To know that any statements made by the reporting party, witnesses, and/or respondent may be used during the process.

- To ***review and respond to any allegation or information*** presented to the decision-maker.

- To present information by relevant and noncumulative witnesses.

- To refrain from making any statement concerning alleged violations of this policy or from participating in the proceedings.

- To be accompanied by an adviser of their choice and at their own expense during the university student conduct process for advisory purposes only. Advisers are not permitted to speak or to participate directly in the university student conduct process unless authorized by the Student Conduct Administrator. When selecting an adviser, students and RSO should consider any scheduled meetings or hearings. Delays in the university student conduct process will not be allowed due to the scheduling conflicts of an adviser.

- Notice of the outcome of the proceedings including a description of any appeal process.

- A decision-maker free from actual bias.

VCU Student Code of Conduct[3] (emphasis added).

16.    Nothing in the Student Code of Conduct says that VCU can ignore such rights if,

in its discretion, it simply decides not to provide them, and nothing in this Code of Conduct says

---

[3]                    https://conduct.students.vcu.edu/student-code-of-conduct/rights-and-responsibilities/#:~:text=All%20student%20and%20RSO%20respondents%20are%20provided%20the,know%20the%20source%20of%20any%20allegation.%20More%20items (visited on September 19, 2023).

that these rights are merely aspirational in nature or just guidelines. To the contrary, these rights and responsibilities are bilateral and contractual in nature.

17.    Separately, for students enrolled in the DNAP Program, VCU provides additional rights through its Graduate Student Handbook ("GSH") for the DNAP Program.

18.    Most importantly, under the "Academic Standing Review Process" section of the GSH, VCU states:

Students have a right to:

● ***fair and accurate evaluations of their progress*** and notice of their status in the program.

● reasonable time commitment consistent with the Standards for Accreditation of Nurse Anesthesia Programs.

● consideration by faculty of ***appropriate corrective measures*** before probation or Dismissal.

Graduate Student Handbook, page 31 (emphasis added).

19.    The GSH also provides DNAP students with due process rights when they are confronted with any adverse recommendations made by the Academic Standard Committee (the "ASC") of the Department. As explained in the GSH, the ASC is the body that "considers all matters related to academic progression and discipline," and, once engaged, it is charged with assessing whether "a student fails to meet minimum academic ***or clinical*** requirements" for the DNAP Program (emphasis added). *Id.*

20.    The GSH provides that whenever the ASC makes an adverse recommendation to the Chair, the student is entitled to receive in writing a letter that "state[s] the reason(s)" for the adverse decision. *Id* at 32.

21.    Students who disagree with the ASC's recommendation have the right to appeal to the Department Chair, and then, if necessary, to the Dean of the College of Health Professions

6

(CHP).  *Id.* at 34.  An appeal to the Dean is a student's final appeal avenue.  After that, the decision is considered final.  *Id.*

22.    Like the rights in VCU's Code of Conduct, the rights in the GSH are contractual in nature and binding on both the DNAP student and VCU.  Indeed, under the GSH, students in the DNAP program are required to electronically sign a statement that says: "This is to certify that I have read and understand the etpDNAP Graduate Student Handbook.  I understand that my failure to be familiar with the contents of the Handbook and associated references may adversely affect my academic standing in the Graduate Program in Nurse Anesthesia."

23.    Nothing in the GSH disclaims or waives any of the contractual rights between the parties, and nothing in the GSH says that the various rights set forth therein are mere aspirational statements or are considered to be non-binding guidelines.

24.    Finally, because VCU's DNAP program, as explained on page 4 of the GSH, is accredited by the Council on Accreditation of Nurse Anesthesia Educational Programs ("COA"), Grullon has rights pursuant to the COA's Standards for Accreditation.

25.    These standards, for example, require that a DNAP "program demonstrates that it processes complaints, grievances, and appeals in a timely and equitable manner ***affording due process***." COA Standards For Accreditation of Nurse Anesthesia Programs ("Standards"), Part G.4. and G.7., *Policy Standards*, page 24 (emphasis added).

26.    The rights, procedures, policies, and standards, especially the due process and appeal rights, set forth in the VCU Code of Conduct, the GSH, and the COA Standards place substantial limits on VCU's ability to dismiss, punish, or otherwise act adversely to DNAP students without good cause. In particular, these rights, procedures, policies, and standards give DNAP students substantial assurances that they will not be dismissed, punished, or have adverse actions

taken against them by VCU without first being able to receive a fair and impartial process which will include (i) notice, (ii) a meaningful opportunity to appear, and (iii) the ability to confront the evidence being considered against them.

27.     By enrolling at VCU – and ultimately paying thousands of dollars in tuition over her semesters at VCU – Grullon entered into an agreement with VCU that entitled her to be, and stay, enrolled at VCU in its DNAP Program so long as she paid the necessary tuition and fees, remained in good standing academically, met the requirements for graduation, and otherwise complied with VCU's conduct rules.

28.     VCU's agreement with Grullon did not permit it to dismiss, punish, or otherwise act adversely against her without first proving good cause to do so.

29.     Grullon had a constitutionally protected property interest in her continued enrollment at VCU in its DNAP Program and to be free from arbitrary dismissal, punishment, or other adverse actions by VCU under the policies, procedures, rights, and standards provided by VCU in its Code of Conduct and its GSH and by the COA Standards, all of which substantially limited VCU's abilities to take any such adverse actions without first providing Grullon with appropriate due process.

30.     Grullon's contractually protected property interest arises under state law by virtue of VCU's policies, procedures, and rights (particularly those set forth in VCU's Code of Conduct and the GSH and in the COA Standards) and is protected by the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

31.     Grullon's constitutionally protected property interest also arises by virtue of the express and implied contractional relationship that existed between Grullon and VCU.

C.      GRULLON BECOMES A VOCAL STUDENT LEADER WHILE ENROLLED IN THE PROGRAM.

32.     While enrolled as a student in the DNAP Program, Grullon was elected to be the President of her class at VCU.  In that role, Grullon frequently interacted with her VCU leadership and, in doing so, frequently raised collective issues, such as the cleanliness of classrooms and having class scheduled published in a timely manner.

33.     At the same time Grullon also was a public and open advocate for minority interests at VCU.  Among other things, Grullon was a member of VCU's DEI[4] Committee, where she and others tried to raise awareness to inner city children and high schoolers about the nursing profession in order to help increase the pipeline of future students.  As well, she was a member of "Diversity CRNA," an organization whose mission is "to inform, empower, and mentor marginalized diverse population with information to prepare them for a successful career in Nurse Anesthesia."[5]  In these roles, Grullon attended and spoke at numerous public meetings at VCU, where she promoted minorities and diversity at VCU.

D.      SUMMER AND FALL OF 2023.

34.     By the Fall of 2023, Grullon had completed five full semesters at VCU in its DNAP Program and was now in her sixth semester in the Program.[6]  As well, under the curriculum of the Program, Grullon was in her third semester which involved a clinical placement.

35.     During that fall semester, Grullon was succeeding in her clinical placement.  Among other positive comments, she received the following praise for her work:

---

[4] "DEI" refers to three closely-linked values: **D**iversity, **E**quity and **I**nclusion. *See* https://en.wikipedia.org/wiki/Diversity,_equity,_and_inclusion (visited on April 9, 2025).

[5] https://www.diversitycrna.org/ (visited on April 9, 2025).

[6] Grullon had also taken several post-graduate courses at VCU prior to entering the DNAP Program and had received grades of 4.0 (A's) in those classes.

- "Very engaged in learning new techniques and styles of anesthesia. Very eager to learn! Great job today!"

- "Strong technical skills using ultrasound for IV and intra-arterial line placements! Great job!"

- "Exhibited great flexibility on her first day at our site along with working with two different clinical instructors! Amazing job with her spinal anesthetic!"

- "This was a great day in part because Ms. Grullon really did a great job connecting with the patients and the anesthesiologist we were teamed with, being prepared and knowledgeable about their comorbidities and having the humility to quickly move to do things in a different way than she may have planned when directed to do so."

- "Miss Grullon performed with great vigilance, knowledge and confidence in her skills. She asks appropriate questions and came well prepared."

36.    Prior to the fall semester, however, Grullon experienced two instances of open racism. First, when Grullon, on behalf of herself and other members in her SRNA class, escalated a grading issue to Dr. Wands, Dr. Wands derisively attacked her, telling her that she acted more like a "thug" leader or a "gang leader" than a student who was the President of her Class at VCU.

37.    Second, Dr. Crystal O'Guinn, who is white, suggested that Grullon should not attend a Diversity CRNA event because, in her words, Grullon would need "too much time to do her  hair and makeup," which would detract from her study time. This comment was based solely on Grullon's appearance and is a comment that a white student would not have faced.

38.    Despite these openly racist comments, Grullon preserved in her coursework and her clinical rotations through the fall of 2023.

39.    Even so, Grullon experienced an unexpected complication in late November 2023. Specifically, on or about November 26, 2023, Grullon came down with COVID-19. She was febrile, short of breath, and lethargic.  She also had two upcoming exams in one of her classes (DNAP738):

Exam 3 Obesity and Geriatrics on Friday December 8, 2023; and a comprehensive final exam on the following Friday, December 15, 2023.

40.    Although Grullon was close to recovering on the day of the first final exam, she had missed out on her normal study time because she had been sick. She also still had brain fog. Even more, Grullon, which was aggravated at the time due to personal matters, suffered from two disabilities (anxiety and ADHD), for which already had a formal "accommodation" form on file with VCU. With these circumstances in mind, Grullon requested that her Exam 3 be moved to Monday, December 11, 2023 and that her comprehensive final be moved in corresponding fashion – to December 18, 2023.

41.    VCU granted the first request, but not the second and kept the comprehensive final date as December 15, 2023. Not surprisingly, Grullon did not perform as well as she expected on the final exam.

E.    THE BOGUS DISMISSAL RECOMMENDATION AND BOGUS DISMISSAL PROCESS.

42.    Not long after grades were completed for the fall semester for 2023, Grullon was recommended to VCU's Academic Standing Committee ("ASC") for dismissal. Grullon was notified of the recommendation and told she could appear before the ASC on January 12, 2024 if she wished to contest the recommendation.

43.    Grullon then appeared before the ASC on that date in order to make her case.

44.    The ASC hearing, however, was a farce. Rather than being an objective review of Grullon, the Committee essentially cross-examined her as if she were a criminal defendant in a courtroom. Indeed, from its harsh tone and interrogation, it appeared that the ASC had already made up its mind about dismissing Grullon and that it was otherwise just going through the motions of the committee meeting.

45.    Four troubling examples of the ASC's questioning stood out.

46.    <u>First</u>, when asking Grullon about her academic problems in the DNAP 738 course (the only course identified by the Committee), a member of the committee completely sidestepped the exigent circumstances (namely, a harsh bout of COVID-19 right around the time she took exams with low scores) which led to Grullon's academic underperformance and instead, asked Grullon about her "repeated pattern of failing tests" and then reached backwards to Grullon's prior coursework in DNAP 735, 736, and 737.

47.    The troubling aspect of this line of questioning, however, is that Grullon ultimately obtained "B" grades in ***all of those classes***, which, of course, is compliant with the program's requirements. Grullon also did not suffer from COVID during the semesters in which she took those other classes, such that she was able to overcome any initial academic struggles in those classes and ultimately succeed in obtaining solid grades.  It begged the following question: why focus on irrelevant courses and inapposite factual situations unless the committee had already decided to hold such coursework *against* Grullon and, in turn, intended to recommend dismissal?

48.    <u>Second</u>, the ASC proactively raised the issue of Grullon's participation in extra-curricular activities – namely, her former leadership role as class President – in a seeming effort to falsely suggest she had poor judgment.  The question was something to the effect of "Why did you choose to continue in your leadership role and with your extra-curricular responsibilities, when you were shown your repeated pattern of failing tests?"

49.    But the nature of the discussion went further – with Dr. Wands actually accusing (falsely) Grullon of lying. Specifically, Dr. Wands pointedly interrupted Grullon's presentation before the ASC and told the Committee that Grullon's decision to relinquish her extra-curricular roles was involuntarily and that she was now being untruthful to the ASC in explaining how she

had handed over her leadership duties to another student.  Before Grullon could provide any context to her comments, Dr. Wands said: "Nope! Nope! Nope! – That opportunity was REMOVED from you as part of your probation!"  And, of course, Dr. Wands was the same person who had derisively accused Grullon of acting like a "gang leader."

50.     The entire discussion indicated that the ASC was intent on punishing Grullon for her prior participation in her extra-curricular activities, which, of course, was public, open, and focused in large part on advancing minorities in nursing.

51.     As well, the ASC's almost obsessive focus on Grullon's alleged "pattern of failing tests" – *despite* her satisfactory academic records – in connection with her extra-curricular activities strongly suggested that the ASC did not actually care to analyze the unique circumstances related to Grullon's mitigating medical circumstances for the late fall of 2023.

52.     Indeed, as the ASC well knew, Grullon was *not* participating in extra-curricular activities in the Fall of 2023.  It follows then that Ms. Grullon did *not* have trouble in her DNAP 739 course because of any such outside activities.  Instead, as the ASC also well knew, Grullon had trouble in DNAP 739 because of COVID, combined with her pre-existing ADHD and anxiety (which was exacerbated by marital troubles at the time).  As Grullon had candidly explained in her written submission to the ASC, she encountered the "perfect storm" of difficult life events, all of which intersected with each other at the same time.  For all practical purposes, the ASC wholly ignored these critical facts.

53.     Third, the ASC asked several questions about Grullon's alleged prior alleged unprofessional behavior even though such alleged behavior had already been addressed – *__and corrected__* – through a prior probationary period which Grullon successfully completed.  The ASC

was undeterred in its focus on this alleged behavior, however, and, ***again***, acted as if it had already made up its mind prior to Grullon's appearance before it.

54.    Fourth, the Committee, especially Dr. Wands, was openly hostile to Grullon when she attempted to show contrition and self-awareness in addressing it.  Most notably, when Grullon said that she hoped to work in a collaborative way with the ASC and her superiors, she was immediately cut-off and chastised.  She was told in no uncertain terms that her appearance at the ASC was not a "collaboration" The exact words used were: "This is not a collaborative meeting. So, ***we don't sit down and collaborate on a plan***.  This is your opportunity to make a statement." This hostility underscores the fact that the Committee simply did not care what Grullon had to say and did not otherwise keep an open mind as to her presentation.

55.    Soon after the meeting ended, the ASC issued a formal recommendation that Grullon be dismissed from the DNAP Program.  Dr. Wands authored the formal recommendation letter and was otherwise an instrumental and material part of the ASC's decision.

56.    Then, on January 16, 2024, Dr. Damico sent an e-mail to the members of the ASC which purported to thank them for their review and advise them that she was upholding their dismissal recommendation for Grullon

57.    In her e-mail, however, Dr. Damico also communicated the dismissal decision for Grullon to Dr. Hampton (the Assistant Dean for Academic Affairs and Student Services), who, in turn, communicated that decision to Dr. Song.  The e-mail then stated: "that THEIR DECISION [i.e., Hampton's and Son's] was to support the decisions of the ASC for dismissal of . . . Grullon."  *See* Email attached as **Exhibit A**. In other words, Dr. Hampton and Dr. Song supported Grullon's dismissal on or before January 16, 2024.

58.     Dr. Damico's preemptive discussion about Grullon's dismissal with Dr. Song *before Grullon had even filed her appeal of the decision* violated Grullon's right to due process. This is because ***Dr. Song*** is the person to whom Grullon was required to submit her appeal of the decision by the ASC and Dr. Damico. In short, the outcome of Grullon's appeal was a foregone conclusion, regardless of what she submitted.

59.     Not surprisingly, Dr. Song rejected Grullon's appeal and forced her appeal her dismissal recommendation further to the University's Admissions and Academic Standards Committee of the University Graduate Council

60.     This too was a force.  Specifically, even though Grullon appeared before this body on May 13, 2024, she was not allowed to present any witness testimony (and she had, in fact, brought a witness with personal knowledge of relevant facts) or have her legal representative (who also attended) speak on her behalf or ask questions.

61.     Nor did the committee even care about the issues before it.  Although the main issue raised in Dr. Song's letter related to Grullon's grades, Dr. Gupta, the head of the committee, said in the hearing that he didn't care about the grade but, instead, was concerned about the lack of professionalism – a euphemism for her outspoken and minority-focused behavior.

62.     As before, the review was truncated and had all of the hallmarks of a rubber stamp. To that end, by letter dated May 28, 2024, Dr. Gupta upheld Grullon's dismissal from the DNAP Program.

F.      **DISPARATE TREATMENT.**

63.     In addition to the problems identified above, Grullon's dismissal was inconsistent with the reviews and decisions provided by the ASC (and other committees) as to certain white SRNA students who were not outspoken in their activities at VCU.

64.    Indeed, one such student (who was white) engaged in behavior while working a rotation that was downright unsafe (and could have caused serious harm to a patient). Yet, he was only partially disciplined and was allowed to remain at VCU.

65.    Likewise, another white student who did not perform well on his grades was allowed to take a year off and then re-enroll in the DNAP program. Grullon, however, was not afforded any such opportunity and instead was permanently dismissed from the Program.

**G.    THE AFTERMATH.**

66.    Since the date of her unlawful dismissal from the DNAP Program, Grullon has had her professional growth as a CRNA unlawfully stunted. Grullon, for example, cannot properly transfer the VCU credits she has earned in the DNAP program, because most programs only recognize their own training and credits or otherwise place substantial limits on the amount of credits that they will accept. In other words, Grullon would have to go back to square one and start all over in any DNAP program at another college or university.

67.    Grullon's dismissal also has cost her employment opportunities.

68.    Finally, Grullon has suffered substantial reputational harm, emotional distress, pain and suffering and anxiety because of her unlawful separation and the false allegations that were made against her in order to justify the separation.

**COUNT I:**
**PROCEDURAL DUE PROCESS CLAIM**
**(AGAINST ALL DEFENDANTS)**

69.    The allegations of paragraphs 1-68 are realleged as if fully set forth herein.

70.    As shown by the allegations herein, Grullon had a property interest in both the DNAP Program and thus had due process rights under the U.S. Constitution to receive notice and a full and fair review of any allegations against her prior to her removal from the DNAP Program.

71.    Here, however, Defendants, in their individual and official capacities, deprived Grullon of her due process rights by denying her proper due process prior to her removal from the DNAP program.

72.    As a result of defendants' actions, Grullon's professional growth as a CRNA has been unlawfully stunted and derailed.

73.    All of the individual defendants acted under color of state law and their actions deprived Grullon of a federally protected right.

**COUNT II:**
**DUE PROCESS VIOLATION: LIBERTY INTEREST**
**(AGAINST THE INDIVIDUAL DEFENDANTS)**

74.    The allegations of paragraphs 1-73 are realleged as if fully set forth herein.

75.    Under the Fourteenth Amendment, Grullon has a liberty interest to engage in the commonplace occupations of her life and with respect to her good name, reputation, honor, and integrity.

76.    Here, the individual defendants, all of whom are agents of a governmental body acting under color of state law, violated Grullon's liberty interests by stating false grounds for her removal from the DNAP Program.

77.    These false accusations impugn Grullon's good name, honor, reputation, and integrity, thus causing a stigma to her reputation, and were made in connection with her removal from the DNAP Program.

78.    Also, the false statements at issue were publicized.

79.    As well, upon information and belief, the statements have been memorialized in e-mails and/or memos which are kept in files maintained by VCU.

80.     As a direct result of the actions of the defendants named in this Count, in violation of the rights secured to her under 42 U.S.C. § 1983, Grullon has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith.  Additionally, Grullon has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

81.     Further, the individual defendants' actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Grullon's rights, thus entitling her to punitive damages.

82.     Finally, the individual defendants denied Grullon any type of legitimate name-clearing hearing which would have allowed her to refute and negate the false allegations that were made against her.  To the contrary, the facts show that all of the so-called hearings provided to Grullon were rubbers stamps for a preordained outcome.

### COUNT III:
### TITLE VI DISCRIMINATION CLAIM
### (COLOR, SEX, AND NATIONAL ORIGIN)
### (AGAINST VCU)

83.     The allegations of paragraphs 1-82 are realleged as if fully set forth herein.

84.     By virtue of her status as a black female, Plaintiff is entitled to Title VI's protection against discrimination based on her color.

85.     Under Title VI, it is unlawful for an institution to discriminate against a student on the basis of, *inter alia* race, color, and national origin.

86.     As is clear from the allegations stated herein, Plaintiff was discriminated against and her enrollment ended based on her color, her sex, and her national origin.

87.     As a direct result of VCU's discrimination, Plaintiff has been caused to suffer the loss of educational and professional opportunities.  Additionally, she has been caused to suffer

personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of VCU's unlawful behavior.

88.     VCU's actions also constitute gross, wanton, malicious, reckless, and/or intentional violations of Plaintiff's rights, thus entitling her to punitive damages.

**COUNT IV:**
**FIRST AMENDMENT RETALIATION**
**(AGAINST ALL DEFENDANTS)**

89.     The allegations of paragraphs 1-88 are realleged as if fully set forth herein.

90.     Grullon engaged in protected activities under 42 U.S.C. § 1983 (through the Fourteenth Amendment of the Constitution) when she exercised her rights under the First Amendment of the Constitution to participate in student groups at VCU which promoted diversity and to openly support such diversity.

91.     Defendants were well aware of Grullon's protected activities and/or believed that she had engaged in such protected activities, and were well aware that any retaliation based on Grullon's protected activities would violate her rights under clearly established law.

92.     Notwithstanding this awareness, Defendants violated Grullon's rights under the First Amendment when they had her removed from the DNAP Program as a result of her speech with respect to, and participation in, these groups.

93.     Defendants acted with malicious intent to deprive Grullon of her First Amendment rights, as secured under Section 1983, and to do her injury.

94.     As a direct result of Defendants' actions, in violation of the rights secured to Grullon under Section 1983, Grullon has been caused to suffer the loss of her professional potential and all of the benefits that go with it. Additionally, Grullon has been caused to suffer personal

injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of Defendants' actions.

95.     Further, Defendants' actions constitute gross, wanton, malicious, reckless and/or intentional violations of Grullon's rights, thus entitling her to punitive damages.

### COUNT V:
### DISCRIMINATION/
### DENIAL OF REASONABLE ACCOMMODATION UNDER THE ADA
### (AGAINST VCU)

96.     The allegations of paragraphs 1-95 are realleged as if fully set forth herein.

97.     Grullon is a "qualified individual" with a "disability" as those terms are used and defined under the ADA and its subsequent amendments.

98.     With respect to her exams in December of 2023, Grullon requested a reasonable accommodation under the ADA due to her disability.   VCU failed to provide such a reasonable accommodation and thereafter dismissed her from the DNAP Program due, in part, to allegedly failing to meet standards she would have otherwise met had she been provided the requested reasonable accommodation.

99.     VCU's dismissal from the DNAP Program and its failure to provide Grullon with a reasonable accommodation both violate Title II of the ADA.

100.    As a result of VCU's actions, Grullon has suffered damages, including emotional pain and suffering, embarrassment, inconvenience, mental anguish, and loss of enjoyment of life.

### COUNT VI:
### BREACH OF CONTRACT
### (AGAINST VCU)

101.    The allegations of paragraphs 1-100 are realleged as if fully set forth herein.

102.    VCU and Grullon have a valid binding agreement between them as to the terms of her enrollment in the DNAP Program.

103.    VCU breached the terms of the enrollment agreement when it dismissed her from the DNAP Program.

104.    As a result of VCUs breach of the enrollment agreement, Grullon has been caused to suffer substantial economic and compensatory damages, including incurred tuition costs; anxiety, distress, emotional damages, and mental health damages; future financial damages and losses related to having her participation in the DNAP program unlawfully thwarted by VCU.

WHEREFORE, Plaintiff requests this Honorable Court to:

a.    Accept jurisdiction of this case.

b.    Declare that Plaintiff has suffered a violation of her due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution at the hands of the individual defendants, in their individual and official capacities.

c.    Declare that Defendants violated Plaintiff's rights under Title VI of the Civil Rights Act.

d.    Declare that Defendants retaliated against Plaintiff for her exercise of her rights under the First Amendment.

e.    Declare that Defendants violated Plaintiff's rights under Title II of the ADA.

f.    Award Plaintiff compensatory damages for, among other things, the humiliation, mental and emotional distress, and pain and suffering that she has experienced and endured as a result of the unlawful actions of the defendants. Such damages shall be in an amount in excess of five hundred thousand dollars ($500,000.00), the exact amount to be determined at trial.

g.    Award Plaintiff compensatory damages for, among other things, the economic, professional, and potential employment losses she has suffered as a result of the

unlawful actions of Defendants. Such damages shall be in an amount in excess of one million dollars ($1,000,000.00), the exact amount to be determined at trial.

h.  Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law.

i.  Award Plaintiff three hundred fifty thousand dollars ($350,000.00) in punitive damages against the individual defendants;

j.  Grant Plaintiff him reasonable expenses, costs and attorney's fees.

k.  Order as prospective injunctive relief that the individual defendants, acting for VCU, overrule the decision to remove Grullon from the DNAP Program and reinstate her into the Program.

l.  Award all statutory damages available to Grullon under the ADA and Title VI.

m.  Grant such other and further relief as to the Court seems just and proper.

**A TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

YELITZA GRULLON, SRNA, BSN, RN, CCRN

By:    /s/Richard F. Hawkins, III
        Richard F. Hawkins, III, VSB# 40666
        THE HAWKINS LAW FIRM, PC
        2222 Monument Avenue
        Richmond, Virginia 23220
        (804) 308-3040 (telephone)
        (804) 308-3132 (facsimile)
        Email: rhawkins@thehawkinslawfirmpc.com